UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LARRY BEVENS,

                Plaintiff,

    -against-                                                    5:13-CV-0470 (LEK)

CAROLYN W. COLVIN,
Commissioner Of Social Security,

                Defendant.

_____

## MEMORANDUM-DECISION and ORDER

**I.    INTRODUCTION**

This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed in appealing a denial of Social Security benefits. Both parties have filed briefs. Dkt. Nos. 11 ("Plaintiff's Brief"); 16 ("Defendant's Brief"). For the following reasons, the judgment of the Social Security Administration ("SSA") is remanded for further proceedings.

**II.    BACKGROUND**

    **A. Plaintiff's Medical Records**

Fifty-one year old Plaintiff Larry S. Bevens ("Plaintiff") has a history of health issues, which include chronic obstructive pulmonary disease ("COPD"), diabetes mellitus type 1, lower back pain caused by lumbosacral strain/sprain, right shoulder osteoarthritis, hyperlipidemia, depression, and obesity. Dkt. No. 10 ("Record") at 165, 204, 255, 265, 266, 285.[1]

Plaintiff was admitted to the State University of New York Upstate Medical University ("University Hospital") on October 26, 2009, after exhibiting symptoms of polyuria, polydipsia and

---

[1] Citations to the Record are to the pagination assigned by the SSA.

polyphagia. R. at 177. Dr. Nitish Kosaraju ("Dr. Kosaraju") diagnosed Plaintiff with diabetic ketoacidosis, uncontrolled blood sugars, new onset type 2 diabetes, hypertension, obesity, and dyslipidemia. Id. On discharge, Plaintiff was prescribed aspirin, Lisinopril, Lantus insulin, Humulin R insulin, and Lipitor and additionally instructed to check his blood sugars four times a day. Id.

On December 23, 2009, Plaintiff visited the Joslin Diabetes Center ("Joslin") to follow up on his diabetes diagnosis. R. at 214. Dr. Rachel Hopkins ("Dr. Hopkins") found that Plaintiff was continuing to use his medications as prescribed, and also noted that Plaintiff becomes easily fatigued and occasionally becomes "jittery and lightheaded" when he has not eaten. R. at 214-215. Moreover, Dr. Hopkins further noted that Plaintiff was doing volunteer work as a part of receiving public assistance. R. at 183. At this point, Plaintiff was also smoking about five cigarettes a day, having cut back from two packs a day. Id.

Plaintiff visited University Hospital on December 31, 2009, where an x-ray of Plaintiff's chest conducted by Dr. Steven Forman ("Dr. Forman") revealed a normal heart but chronic lung changes. R. at 159. Plaintiff visited Syracuse Community Health Center ("SCHC") for an evaluation of dyspnea on exertion. R. at 275. At this visit on February 1, 2010, Plaintiff reported he could not climb a flight of stairs or walk any distance outside without becoming short of breath. Id. At a February 3, 2010 visit, Dr. Hopkins noted that Plaintiff was making a conscientious effort to stay on schedule with his diet and medications. Id. While Plaintiff's visit notes detail his generally fatigued state, Dr. Hopkins assessed his diabetes as "improving control" and hypertension as "well controlled." R. at 218.

Plaintiff returned to SCHC on February 22, 2010 to see Dr. Edward Sivak ("Dr. Sivak") for

a follow-up to pulmonary function studies that were performed on February 5, 2010. R. at 165. Plaintiff's complaints of COPD and history of dyspnea on exertion that particularly worsens in overly hot or cool temperatures were also discussed at this visit. Id. The findings suggested a moderate obstruction of the air passageways, with "significant improvement[s] after bronchodilator therapy and a significant reduction in air trapping." Id. The report also suggested that Plaintiff's dyspnea, which allowed him to only walk 417 meters in six minutes, was both out of proportion to his pulmonary function and to what one would expect for a person his age. Id. Plaintiff was instructed to continue with his Symbicort 160/4.5 regimen, to add Spiriva, and to attempt to quit smoking. Id.

On April 14, 2010, Plaintiff visited University Hospital for an outpatient low spine and sacroiliac examination due to dull lower back pain that began two months earlier. R. at 255. Plaintiff complained that this pain functionally limited his ability to care for himself and to perform housework, and necessitated the occasional use of a cane. Id. Moreover, Plaintiff stated that his right lower extremity "gives out." R. at 193. Restorative physical and skilled therapies were recommended twice a week for six weeks in order to address Plaintiff's functional limitations and to help with his lumbar pain and impaired ambulation. R. at 257. However, Plaintiff missed at least three scheduled physical therapy appointments in the following month. R. at 195. In a progress note from March 25, 2010, Plaintiff reported using a cane for a knee problem. R. at 170.

At his May 24, 2010 visit with Dr. Hopkins at Joslin, Plaintiff reportedly had been experiencing hypoglycemia, some numbness in his feet, and was informed of his COPD diagnosis. R. at 179. However, at this point, Plaintiff's type 1 diabetes and hypertension were generally under control and some of his energy had returned. R. at 180. On June 24, 2011, Dr. Leksee Nickson

3

("Dr. Nickson") of SCHC performed a diagnostic x-ray report on Plaintiff's right shoulder, noting "arthritic changes." R. at 285.

Plaintiff was examined by Dr. Christine Ransom ("Dr. Ransom") at Industrial Medicine Associates, P.C ("Industrial Medicine") for a psychiatric evaluation on September 18, 2010. R. at 197. There, Plaintiff indicated his ongoing depression, irritability, lack of energy, preoccupation with the past, and general sedentary mode of living, all stemming from the February 2009 death of his girlfriend of twelve years. Id. Dr. Ransom noted that Plaintiff exhibited "slow and halting" speech, "moderately impaired" attention and concentration, and "borderline" intellectual and cognitive functioning. R. at 198-99. Dr. Ransom opined that Plaintiff was capable of understanding and performing simple tasks, but in light of his depression, Plaintiff would "have moderate difficulty performing complex tasks, relating adequately with others and appropriately dealing with stress." R. at 199. Plaintiff was recommended to seek treatment for depression. Id.

Plaintiff saw Dr. Alex Sirotenko ("Dr. Sirotenko") at Industrial Medicine on September 21, 2010 for an internal medicine exam on a referral from the Division of Disability Determinations. R. at 201. Observing Plaintiff's poorly controlled diabetes, depression, history of COPD, and that "[c]laimant appears as a dyspneic man after walking a standard corridor," Dr. Sirotenko remarked that Plaintiff should avoid activities "greater than a moderate degree of physical exertion [and] would benefit from activities of a sedentary nature only." R. at 202, 204. Finally, an x-ray of Plaintiff's right knee, conducted by Dr. Lawrence S. Liebman, revealed no damage or dislocation. R. at 205.

During a return visit to Industrial Medicine on October 6, 2010, Dr. Kalyana Ganesh performed pulmonary function testing. R. at 206. The examination resulted in a finding of "mild

4

restriction," although Plaintiff apparently gave a poor effort during this testing. R. at 207. At an October 12, 2010 visit to Joslin, Plaintiff admitted that he had not been watching his diet as closely as he had been previously and had gained weight, but also reported that he was only rarely smoking cigarettes. R. at 221. Dr. Hopkins noted that Plaintiff's control of his type 1 diabetes was worsening, so Plaintiff was instructed to return to his dietician for help in achieving a consistent diet, and was encouraged to quit smoking entirely. R. at 222.

On February 25, 2011, Plaintiff saw Dr. Hopkins at Joslin, where Plaintiff denied any numbness or tingling in his feet, but asked to be prescribed diabetic shoes on account of recurring blisters on his foot. R. at 263. Dr. Hopkins indicated that Plaintiff showed "worsening control" of his type 1 diabetes, while his hypertension remained "reasonably controlled." R. at 264. Dr. Hopkins also noted that Plaintiff's blood sugar levels were "remarkably higher." R. at 291. Later that day, Plaintiff saw Dr. Ryan D'Amico ("Dr. D'Amico") to assess callosities on the bottom of his feet, as well as intermittent tingling and muscle spasms. R. at 293. Plaintiff was written several prescriptions, including a Urea 40% foot cream, AmLactin lotion, and diabetic shoes with custom inserts. Id.

On May 27, 2011, Dr. Hopkins increased Plaintiff's Lantus medication to seventeen units. R. at 266. Additionally, Plaintiff's hypertension was listed as "below guidelines," his dyslipidemia exhibited elevated triglycerides, and Plaintiff declined assistance with nicotine dependence cessation. Id. Dr. D'Amico also met with Plaintiff, addressing the painful calluses on the bottom of Plaintiff's feet by debriding the callosities in thickness. R. at 268. Dr. D'Amico assessed Plaintiff with diabetes mellitus with neuropathy and painfully deformed metatarsal right foot. Id.

Plaintiff attended an outpatient visit on November 17, 2011 at the Joslin Center with Dr.

5

Hopkins, mainly complaining of extended bouts of dizziness, frequently having to get up at night to urinate, and feeling very thirsty. R. at 300. Additionally, at this time it is apparent that Plaintiff continued to smoke. Id. Moreover, while Plaintiff denied any numbness or tingling in his feet, chest pains, palpitations, or shortness of breath, he did speak of pain in his legs when walking. Id. At this point in time, Plaintiff's schedule of medications included 17 units of Lantus, Humalog, aspirin 81 mg daily, Lipitor 40mg orally at bedtime, Lisinopril 5mg daily, Ventolin, two puffs of Symbicort twice a day, and Trilipix 135 mg daily. Id. Dr. Hopkins noted that Plaintiff's hypertension was "adequately controlled," and his type 1 diabetes was "uncontrolled," which required an adjustment to his Lantus medication up to 20 units in the morning. R. at 301.

On October 22, 2010, Plaintiff underwent a physical residual functional capacity ("PRFC") assessment with examiner S. Leahy ("Leahy"). R. at 241. Leahy found that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds, stand or walk for at least two hours in an eight hour workday, sit (with normal breaks) for about six hours in an eight hour workday, and push or pull without limitation in using his upper and lower extremities. R. at 242. Leahy also noted that Plaintiff was able to walk heel-to-toe without requiring an assistive device, such as a cane. Id. Plaintiff's PRFC also noted no manipulative, visual, or communicative limitations. R. at 243-44. However, Leahy made note of occasional postural limitations arising from Plaintiff's dyspnea on exertion, poorly-controlled diabetes, history of lower back pain, and legs giving out occasionally. Id. Additionally, because of Plaintiff's history of COPD and chronic lung changes, see id., Leahy found that Plaintiff should avoid concentrated exposure to extreme heat and cold, and humidity, fumes, odors, dusts, gases, and poor ventilation, R. at 244.

State agency psychological consultative examiner E. Kamin ("Kamin") conducted a mental

6

residual functional capacity ("MRFC") assessment of Plaintiff on October 19, 2010, concluding that Plaintiff suffered from major depression. R. at 237. With respect to Plaintiff's possible functional limitations, Kamin determined that Plaintiff's psychiatric issues would only allow him to undertake "simple tasks independently, maintaining a regular schedule and learning new tasks." R. at 239. Kamin determined that Plaintiff was moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for an extended period, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to interact appropriately with the general public, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. R. at 237-38. Although Kamin suggested that Plaintiff might have difficulty with stress management and interpersonal relations, Kamin assessed Plaintiff as "capable of performing unskilled, entry level tasks in a low contact environment." R. at 239.

### B. ALJ Hearing

On July 29, 2010, Plaintiff filed an application for supplementary security income ("SSI"), alleging disability based on his COPD and diabetes beginning September 1, 2009. R. at 122. The SSA denied Plaintiff's application on October 22, 2010, and Plaintiff subsequently filed a written request for a hearing before an Administrative Law Judge ("ALJ") on November 18, 2010. R. at 58-59, 65. On November 21, 2011, ALJ Lawrence Levey ("Levey") conducted a hearing at which Plaintiff appeared with counsel. R. at 14.

Plaintiff's counsel inquired into Plaintiff's medical status and functional capacity. R. 37-42. Plaintiff relayed that his COPD and the effects of the large doses of insulin required for his diabetes

cause him to experience difficulty in ambulation and make him easily fatigue. R. at 37-38. Additionally, Plaintiff experiences numbness in both of his legs after walking or standing for ten to fifteen minutes. R. at 38. When asked about his right shoulder, Plaintiff described a "sharp pain" going from his shoulder to his hand. R. at 38-39. Plaintiff also testified that he occasionally uses a cane because of back pain, depending upon how far he will be walking. R. at 40.

ALJ Levey then asked Plaintiff questions pertaining to his work capabilities, current medical state, and daily life activities. R. at 42-49. Plaintiff confirmed that he stopped working in 2005, and thereafter received counseling for his emotional difficulties after the passing of his girlfriend. R. at 42. When asked about the nature of the volunteer work he engaged in as a condition for receiving public assistance, from December 2009 until December 2010, at a Syracuse public housing apartment complex security desk, Plaintiff stated that "[t]hey just had me sitting at a desk." R. at 43-45. Plaintiff ceased volunteering when he was suspended from the job, after his COPD and related breathing difficulties prevented him from attending work. R. at 44. Although he was unemployed, Plaintiff worked with an agency in order to find a suitable occupation that could accommodate his shortness of breath and fatigue. R. at 276. Plaintiff also described taking short walks, "try[ing] to go around the block at least once a day," although having to constantly take short breaks due to shortness of breath. R. at 46, 48. Moreover, Plaintiff testified that on a typical day he stays inside, attempting to do household chores like cleaning, dishwashing, and vacuuming, while battling shortness of breath, and, additionally, visiting with neighbors. R. at 48.

Vocational expert ("VE") Dian Haller ("Haller") then testified regarding Plaintiff's prior work experience. R. at 51. Since Plaintiff had only held temporary service positions as a bartender, garbage collector, security guard, and a spray painter, it was determined that he had no relevant

8

work experience. R. at 51-52. When asked to assume a hypothetical individual, consistent with the abilities and limitations of Plaintiff—limited to only sedentary exertion, and precluded from exposure to extreme heat, environmental irritants, and any task that is not "simple, routine, and repetitive"—VE Haller concluded that this hypothetical individual would be able to be gainfully employed as a final assembler, a new account clerk, and a packer of optical equipment. R. at 52-53. Next, assuming the same hypothetical individual and the same limitations, VE Haller was asked whether the jobs she cited would be available for an individual who could "only occasionally engage in overhead reaching with his dominant right upper extremity," to which she replied in the affirmative. Id. Finally, when asked about a hypothetical individual consistent with "the abilities and limitations set forth in [Plaintiff's] testimony," including that Plaintiff had such trouble "sitting at a desk and . . . with breathing that he found it difficult to move or to get to work," VE Haller concluded that Plaintiff may not be able to perform any full-time competitive occupations on a regular basis. R. at 54.

### C. The ALJ's Decision

On December 23, 2011, ALJ Levey issued a decision denying Plaintiff's application for disability and SSI. R. at 22. The ALJ found that the Plaintiff had not engaged in any substantial gainful activity since July 29, 2010, and that Plaintiff suffered from a severe combination of impairments, including COPD, diabetes, lumbosacral sprain, right shoulder osteoarthritis, hyperlipidemia, depression, and obesity. R. at 16. Additionally, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. Further, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work,

although with the following limitations: that he must be allowed to alternate between sitting and standing; that he cannot use his dominant right upper extremity for more than occasional overhead reaching; that he is restricted to occasional balancing or stooping while being precluded from climbing, kneeling, crouching or crawling; that he must avoid all exposure to extreme heat or environmental irritants; and, that Plaintiff's work must be limited to simple, routine, and repetitive tasks. R. at 18. Moreover, ALJ Levey determined that while Plaintiff's medical impairments could cause certain of Plaintiff's symptoms, that Plaintiff's testimony was not wholly credible. R. at 19. The ALJ then determined that Plaintiff "has no past relevant work." Id. VE Haller found occupations as final assembler, new account clerk, and inspector-packer of optical equipment appropriate for an individual of Plaintiff's age, education, work experience, and RFC, and that they did exist in the national and local economy. R. at 22. As a result, ALJ Levey concluded that Plaintiff was not disabled at any point since the protective filing date and by the standards set forth in the Social Security Act. Id.

On February 21, 2012, Plaintiff filed a request for review by the Appeals Council of an unfavorable administrative law judge decision. R. at 8. When the Appeals Council denied this request on March 1, 2013, the ALJ's decision became the final decision of the Commissioner. R. at 1-7. Plaintiff filed a timely appeal on April 26, 2013. Dkt. No. 1 ("Complaint").

### III. LEGAL STANDARD

#### A. Standard of Review

When the court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if his decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "even if it might justifiably have reached a different result upon a *de novo* review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when there is substantial evidence to support his decision, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)). In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). If the SSA is able to determine that the claimant is disabled

or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed to the next step. Id.

At step one, the SSA considers a claimant's current work activity to see if it amounts to "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If it does, the claimant is not disabled under SSA standards. Id. At step two, the SSA considers whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in § 404.1509. Id. § 404.1520(a)(4)(ii). If the claimant does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. § 404(P), Appendix I. Id. § 404.1520(a)(4)(iii). If it does not, the SSA moves on to step four to review the claimant's RFC and past relevant work. Id. § 404.1520(a)(4)(iv). A claimant is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work. Id. If the claimant cannot perform her past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the SSA considers the claimant to be disabled. Id.

**IV. DISCUSSION**

Plaintiff asserts two errors in the ALJ's decision: (1) the ALJ's RFC analysis failed to properly assess Plaintiff's need for an assistive device to ambulate effectively and his need to alternate between sitting and standing, and (2) the ALJ failed to resolve an apparent conflict in testimony from VE Haller and the occupational information supplied by the Dictionary of

12

Occupational Titles ("DOT"), as required by Social Security Ruling ("SSR") 00-4p (SSA Dec. 4, 2000). Pl.'s Br. at 3, 8.

**A. RFC Analysis**

*1. Claimant's Need for an Assistive Device*

Plaintiff first asserts that the ALJ's RFC analysis failed to properly consider Plaintiff's need for the use of a cane as a limitation on his ability to perform a full range of sedentary work. Pl.'s Br. at 3-5.

"To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96-9p (SSA July 2, 1996). "The adjudicator must always consider the specific facts of the case." Id. While SSR "96-9p does not mandate that the hand-held assistive device . . . be considered medically necessary, it does require specific medical documentation." Hoke v. Colvin, No. 14-CV-0663, 2015 WL 3901807, at *14 (N.D.N.Y. June 25, 2015).

Plaintiff contends that the medical evidence documents his need to use a cane. Pl.'s Br. at 4. Specifically, Plaintiff suffers from neuropathy causing numbness in his feet. Id. (citing R. at 179, 261). Plaintiff also experiences calluses on his feet. R. at 268. Additionally, Plaintiff suffers from lower back pain, which he reported caused decreased mobility and his right lower extremity to "give out." R. at 255. Plaintiff reported using a cane. Id. At the hearing, Plaintiff reported using a cane on account of his back. R. at 40.

However, Plaintiff has not identified specific medical evidence establishing that Plaintiff required the use of a cane. Plaintiff merely points to statements by Plaintiff that he "sometimes"

13

uses a cane. R. at 46. Moreover, the Record indicates that Plaintiff was able to walk with a normal gait and on his heels and toes without the use of a cane. See R. at 202, 242. Because Plaintiff has not identified "medical documentation establishing the need for a hand-held assistive device in aid in walking and standing," SSR 96-9p, it was not error for the ALJ to not include the use of a cane in Plaintiff's RFC. See Golden v. Comm'r of Soc. Sec., No. 11-CV-654, 2014 WL 2215768, at *8 (N.D.N.Y. May 29, 2014) (holding that ALJ's failure to include use of cane in RFC determination was not error where there was no evidence that plaintiff's use of a cane was medically necessary).

Plaintiff also contends that the failure to present the VE with a hypothetical involving Plaintiff's need for a cane was error. Pl.'s Br. at 5. This contention is without merit because the ALJ properly determined that Plaintiff's use of cane was not a limitation on his RFC. See Dumas v. Schweiker, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983) ("The ALJ is responsible for determining, based on all the evidence, the claimant's physical capabilities.").

*2. Claimant's Need to Alternate Between Sitting and Standing*

Plaintiff next argues that the ALJ erred in failing to specify the frequency with which Plaintiff needs to alternate sitting and standing in his RFC analysis. Pl.'s Br. at 5. Plaintiff asserts that a specific frequency was especially relevant because the VE, when posed a hypothetical by Plaintiff's counsel of an individual required to shift positions every fifteen minutes and walk for five minutes every hour, testified that no competitive positions would be available under those conditions. Id. at 6.

SSR 96-9p provides:

An individual may need to alternate the required sitting of sedentary work by standing . . . periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be

14

eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

SSR 96-9p.

The ALJ found that Plaintiff has the RFC to perform sedentary work with the limitation of being "allowed the option to alternate between sitting and standing positions throughout the workday." R. at 18. The ALJ therefore did not specify a frequency with which Plaintiff needs to alternate sitting and standing. However, while the RFC assessment must be "specific as to the frequency of the individual's need to alternate sitting and standing," the assessment ultimately "will depend on the facts in the case record." SSR 96-9p. In this case, the only evidence in the record as to the frequency that Plaintiff needs to alternate sitting and standing was Plaintiff's testimony. R. at 38.[2] Plaintiff has not identified objective medical evidence supporting Plaintiff's need to shift position every fifteen minutes and to walk about five minutes every hour. The ALJ is not required to specify a frequency in the absence of evidence establishing such. While evidence indicated Plaintiff's need to shift positions to accommodate numbness in his feet, R. 255, 300, it did not indicate the frequency with which he needs to do so. The Court accordingly finds that the ALJ did not err in not specifying a frequency with which Plaintiff needs to alternate sitting and standing. See

---

[2] Q: I understand that you have some numbness in your legs, is that correct?

A: Yes. When I walk for a while or stand for a while, they start to get numb, and they start to shake.

Q: Okay. Can you tell us what a while means to you?

A: Well, if I'm in a permanent position, 10, 15 minutes.

R. at 38.

15

Magee v. Astrue, No. 5-CV-413, 2008 WL 4186336, at *7 (N.D.N.Y. Sept. 9, 2008) (holding that ALJ's determination that the plaintiff needed to alternate between sitting and standing at will was sufficiently specific to satisfy the requirements of SSR 96-9p).

### B. Conflicts in VE's Testimony

Plaintiff next argues that the ALJ failed to resolve an apparent conflict between the VE's testimony and the occupational information provided by the DOT. Pl.'s Br at 8. During the administrative hearing, VE Haller, responding to a hypothetical scenario based on Plaintiff's vocational profile and RFC, concluded that the following occupations in the national economy would be available to Plaintiff: final assembler (DOT 713.687-018), new account clerk (DOT 205.367-018), or packer of optical equipment (DOT 713.684-038). R. at 52-53. Under the DOT, each of these occupations requires *frequent* overhead reaching. See United States Department of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("Selected Characteristics of Occupations"). However, in his RFC assessment, the ALJ limited Plaintiff to work requiring *occasional* overhead reaching. R. at 18. "Occasionally" refers to an "activity or conditions [that] exists up to 1/3 of the time," while "frequently" means an "activity or condition [that] exists from 1/3 to 2/3 of the time." Selected Characteristics of Occupations, App. C.

SSR 00-4p states that "[w]hen there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p. This includes apparent conflicts with the "companion publication" to the DOT, the Selected Characteristics of Occupations. Id. "Neither the DOT nor the VE . . . evidence

automatically 'trumps' when there is a conflict." Id. However, the ALJ "must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than the DOT information." Id. The ALJ "has an affirmative responsibility to ask about any possible conflict between th[e] VE . . . evidence and information provided in the DOT." Id.

Here, there was an apparent conflict between VE Haller's testimony that Plaintiff could perform occupations requiring frequent reaching and the ALJ's RFC assessment limiting Plaintiff to work requiring only occasional reaching. See Prochaska v. Barnhart, 454 F.3d 731, 736 (7th Cir. 2006) (finding conflict where ALJ asked VE for work that required only occasional reaching and VE named occupation that required frequent reaching). The ALJ therefore had an obligation to resolve this apparent conflict. However, the ALJ only asked a catch-all question as to the consistency of the VE's testimony with the DOT, to which VE Haller responded affirmatively. R. 54. The ALJ did not address the inconsistency in his decision. "The ALJ's catch-all question to the vocational expert regarding any inconsistencies between the expert's testimony and the DOT does not satisfy the ALJ's duty to identify, explain, and resolve the conflicts between the expert's testimony and her decision." Patti v. Colvin, No. 13-CV-1123, 2015 WL 114046, at *6 (W.D.N.Y. Jan. 8, 2015). Because the ALJ did not obtain a reasonable explanation from the VE for her deviation from the DOT, nor provide a basis for relying on the VE's testimony rather than the DOT, the Court cannot determine whether substantial evidence supports the ALJ's step five findings. See id. at *5-6 (remanding where VE testified that claimant was capable of performing occupations requiring frequent reaching but claimant's RFC only allowed for occasional reaching). Remand for further proceedings is accordingly required.

**V.     CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that this case is **REMANDED** for further proceedings consistent with this Memorandum-Decision and Order, pursuant to Sentence Four of 42 U.S.C. § 405(g); and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the local rules.

**IT IS SO ORDERED**.

DATED:     September 30, 2015
           Albany, New York

Lawrence E. Kahn
U.S. District Judge